FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ NOV 09 2017 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
WINIFRED DWYER,

        Plaintiff,

-against-

TIMOTHY O. HORNE, AS ACTING ADMINISTRATOR OF THE GENERAL SERVICES ADMINISTRATION,[1]

        Defendant.
-----------------------------------------------------------x

12 CV 1176 (NG) (VMS)

**OPINION AND ORDER**

**GERSHON, United States District Judge:**

Plaintiff, Winifred Dwyer, brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e) *et seq.* ("Title VII"), alleging two claims against the Administrator of the General Services Administration ("GSA"), one for a hostile work environment and the other for retaliation. Defendant acknowledges that disputes of material fact exist regarding whether plaintiff was in fact subjected to a hostile work environment or retaliation and moves for summary judgment only on the grounds that: (1) plaintiff cannot sue GSA pursuant to Title VII because GSA was not plaintiff's employer; and (2) plaintiff failed to properly exhaust her claims prior to filing suit. For the reasons set forth below, defendant's motion is GRANTED.

**I.**    **Facts**

    **A.**    **Plaintiff's Hostile Work Environment and Retaliation Claims**

Plaintiff was a security guard in a federal office building in Manhattan. The building was managed by GSA, a federal agency, but plaintiff worked for a private security company, called

---

[1] As of January 24, 2017, Timothy O. Horne became the Acting Administrator of GSA, and is substituted as the sole and proper defendant in place of Dan M. Tangherlini pursuant to Fed. R. Civ. P. 25(d).

1

G4S. On December 28, 2011, a GSA property manager named Steven Sarnecky approached plaintiff at her post near the metal detectors and pointed at her. Sarnecky ordered her to do a full-blown anal cavity search of a male entering the screening area.[2] Plaintiff alleges that this comment constituted sexual harassment and sex-based discrimination, as she was the only female employee working at or near the post at that time. Plaintiff refused to conduct the search, and Sarnecky walked to the elevator bank, which he knew would be out of view of the security cameras, and began making sexual gestures.

Plaintiff filed a report documenting the harassment, as did other male guards working at the time who witnessed it. Thereafter, Sarnecky began visiting plaintiff's post daily, threatening to have her transferred, to cut her pay and cut her hours, and calling her various derogatory names. Eventually, Sarnecky came to her post and told her she was being transferred from her unarmed post at 201 Varick Street to an armed post at 26 Federal Plaza on his direct orders. This was a problem for plaintiff, because she had a paralyzed trigger finger from a previous injury and she would not be able to pass the firearms test. Her wages were cut and her hours were reduced at the new post.

Sarnecky then had himself transferred to 26 Federal Plaza as well and began coming by plaintiff's new post. He told her that he was the one who orchestrated her transfer, cut her hours, and reduced her schedule. He said there would be further retaliation if she did not keep her mouth shut, and he used highly offensive language. Plaintiff asked her supervisors at G4S why her hours were being cut, and was told that it was done on Sarnecky's order. Plaintiff continued to complain

---

[2] Sarnecky admits to making the comment about the anal cavity search, but claims it was a joke. He denies any further interactions with plaintiff after December 28, 2011. As with this and all other factual disputes, I credit plaintiff's version of the facts in accordance with the standard on a motion for summary judgment.

to the EEO office at GSA, which was Sarnecky's employer, but nothing was done to abate the harassment. Plaintiff testified that Sarnecky again ordered her to be transferred, this time to Harlem, far from her home in Brooklyn, with a further reduction in hours and wages.

### B. GSA's Involvement in Plaintiff's Employment

It is undisputed that plaintiff was hired and paid by a private company, G4S, not GSA. Plaintiff's position is that GSA was her joint, or constructive, employer, along with G4S. The relationship between the two entities is as follows: Plaintiff was hired as a Protective Security Officer ("PSO") in 2003 by HWA, a private corporation which provided security guard services at various federal buildings throughout New York City. HWA later became Wackenhut Services Incorporated, which later became G4S. Plaintiff was employed by G4S and its predecessor companies as a PSO from 2003 until 2013, when G4S lost the contract for PSO services in federal buildings. At no time was plaintiff directly employed by GSA or any federal agency.

G4S and its predecessor companies were retained to provide protective services in certain federal buildings by the Federal Protective Service, which is presently a component of the Department of Homeland Security ("DHS").[3] Those buildings were managed by GSA, which is an independent federal agency that, among other things, constructs, leases, repairs, alters, and manages real property, such as federal office buildings. To recap, plaintiff was an employee of a private contractor, which was hired by DHS to provide security in a building managed by GSA.

Formally, GSA had very little involvement with the Protective Security Officers.[4] GSA was not a signatory to the contract between the Federal Protective Service and G4S. Pursuant to

---

[3] Prior to 2003, FPS was a component of GSA, but that is not the basis for plaintiff's argument that GSA was plaintiff's employer and is not relevant to this motion.

[4] GSA does not dispute that, if a contractor needed to enter the building to do maintenance work, and needed to bring tools into the building, a GSA employee would either send a memo to the Protective Security Officers or would have to come to the post and sign that contractor in.

3

that contract, G4S was to "provide and maintain all management, supervision, manpower, training, equipment, supplies, licenses . . . pre-employment screening . . . necessary to accomplish security guard services . . . ." Under the express language of the contract, G4S was the party responsible for management and oversight of all activities including the assignment of Protective Security Officers.[5] The contract between G4S and the Federal Protective Service includes a "Statement of Work," which describes the general duties and performance requirements that G4S was required to provide under the contract. According to the Statement of Work, the Federal Protective Service (a component of DHS, not of GSA) issues post orders that describe the duties that Protective Security Officers are to perform at various posts. GSA is not mentioned in the Statement of Work.

Despite the lack of formal authority, the parties dispute how much involvement GSA actually has in the day-to-day operations of Protective Security Officers. Defendant's position is that GSA cannot issue orders to Officers, cannot alter their duties, work locations, or hours, and has no authority to fire officers. In support of this position, defendant cites to: (1) the testimony of Francisco Lopez, plaintiff's G4S supervisor, who testified that a G4S supervisor would be the one to discipline Protective Security Officers and that GSA could not instruct security officers how to screen the visitors to a building; (2) the Statement of Work; (3) the testimony of David Segermeister, a GSA Director who testified that GSA, and specifically Steven Sarnecky, had no authority to influence the employment, duties, or hours of security officers; (4) the formal position descriptions for a GSA Building Manager, which do not include any supervision of security officers; and (5) the testimony of G4S project manager James Carbonaro, who testified that he believed the contract that G4S had was with Federal Protective Service, not GSA, and that he did

---

[5] Although plaintiff disputes the role of GSA, she offers no evidence contradicting the language and meaning of the contract.

not remember "anything that had to do with GSA." Defendant further points out that, in plaintiff's EEO complaint regarding Sarnecky, she stated that Sarnecky had given her an order to conduct a "full blown anal cavity search," but also claimed Sarnecky did not have the authority to issue her a direct order.

Plaintiff does not argue that the Statement of Work or the formal job descriptions, which give GSA no role in supervising, hiring, or firing security officers, are inauthentic. Plaintiff's position is simply that—regardless of the formal relationship between GSA, DHS, and G4S—GSA employees must have had authority, formal or otherwise, over plaintiff's hours and job location, because it was a GSA employee, Steven Sarnecky, who, by his own admission, had her transferred and her hours reduced to retaliate for her filing a complaint. She bases her conclusion both on Sarnecky's own statements to her that he was responsible for her transfer,[6] and statements by her supervisors at G4S that her hours were cut on Sarnecky's orders.[7] Plaintiff also testified that GSA employees would tell her to change posts, including to a post operating an elevator that was outside the scope of her post order and training, and can request that she be transferred or terminated.

With regard to plaintiff's transfer, defendant contends that, pursuant to the contract between FPS and G4S, all G4S security posts were becoming armed posts, meaning that the officer

---

[6] "Q: Was it your impression that [G4S Project Manager James Carbonaro] had the final say in terms of your transfers, cutting your hours? A: No, no, no. Q: So who? A: Who has the say, GSA, GSA orders the transfer, just like I explained to you before. Sarnecki [sic] told me after I filed out, after I did the report on him, you're going to be transferred, your hours is going to be cut, it was done, that shows you the level of control that GSA has over us. Whatever they say goes." (Pl.'s Mar. 17, 2016 Dep. at 156:23–157:10.)

[7] "Q: If you had a week where you worked 15 or 12 hours did you ask anyone why you were given those number of hours? A: I asked all the supervisors, they told me to talk to Sarnecki[sic], that's his order." (Pl.'s Mar. 17, 2016 Dep. at 88:22–89:1.)

5

who worked there needed to have, and be trained and certified to use, a firearm.[8] Defendant's version is that plaintiff was transferred to 26 Federal Plaza because her current post was becoming an armed post, and she was transferred along with 4 or 5 other unarmed PSO's to the last remaining location with unarmed posts. Defendant does not explain any subsequent transfer to Harlem, nor does it address any reduction in hours and wages.

## II. Procedural History

Plaintiff originally brought this action against G4S, G4S employees James Carbonaro, Brian O'Connor, Ron Middleton, George Caraballo, "Sgt. Barber," and Renato Velati ("G4S defendants"); the head of GSA, which at the time was Michael Robertson but is now Timothy O. Horne; and Janet Napolitano, as Secretary of DHS. GSA and DHS moved to dismiss for failure to state a claim, on the grounds that plaintiff had failed to timely file an EEO complaint regarding her claim. The federal defendants did not make the joint employer argument they make here, and in fact specifically conceded in their briefing papers that the question of whether plaintiff was constructively an employee of either DHS or GSA was not ripe for resolution at the motion to dismiss stage because discovery was needed.

The federal defendants' motion was denied as to GSA and granted as to DHS. (Feb. 20, 2014 Opinion and Order at 9.) Subsequently, all the G4S defendants were dismissed from the case by stipulation. Thus only the claims against GSA remain.

---

[8] Plaintiff purports to dispute this in her response to defendant's Rule 56.1 statement, but cites only to an email which in fact supports defendant's allegation. (Pl's R. 56.1 response ¶ 96.) Regardless, as discussed below, I credit plaintiff's assertion that the true motivation for her transfer was Sarnecky's retaliation for her complaint.

6

## III. Discussion

### A. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate if the movant demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). "A dispute is not genuine unless the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Shiflett v. Scores Holding Co., Inc.*, 601 Fed. Appx. 28, 29 (2d Cir. 2015) (internal quotation omitted). A court is required to "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010). The moving party bears the burden of proof that no genuine issues of fact exist, but, once it satisfies this initial burden, the burden then shifts to the nonmoving party to present evidence that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323. "Summary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Rosenfeld v. Hostos Comty. Coll.*, 554 Fed. Appx. 72, 73 (2d Cir. 2014).

### B. Title VII Claim

The "existence of an employer-employee relationship is a primary element of Title VII claims." *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006). The Second Circuit usually employs a thirteen factor test to determine whether a defendant is an employer within the meaning of Title VII, but "only in situations that plausibly approximate an employment relationship." *O'Connor v. Davis*, 126 F.3d 112, 115 (2d Cir. 1997). If, as here, a defendant did not hire plaintiff in the first instance or pay any portion of the plaintiff's wages, then no further analysis is required. *Id.* ("a prerequisite to considering whether an individual is [an employee] is that the individual have been hired [by the alleged employer] in the first instance"); *Gulino*, 460

7

F.3d at 372 ("In determining whether a person has been 'hired,' we look primarily to 'whether [plaintiff] has received direct or indirect remuneration from the alleged employer'" (quoting *Pietras v. Bd. of Fire Comm'rs of the Farmingville Fire Dist.*, 180 F.3d 468, 473 (2d Cir. 1999))). Here, it is not disputed that it was G4S and its predecessors, not GSA, that hired and paid plaintiff.

1. Joint Employer Liability

Where a plaintiff is not a direct employee of a defendant, a defendant may still be liable under Title VII under one of several theories. In *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 197 (2d Cir. 2005), the Circuit stated that, in the context of Title VII, there are two "recognized doctrines that enable an employee in certain circumstances to assert liability against an entity that is not formally his or her employer." *Arculeo* presented those doctrines as (1) the "single employer" or "single integrated employer" doctrine; and (2) the "joint employer" doctrine. *Id.* "A 'single employer' situation exists 'where two nominally separate entities are actually part of a single integrated enterprise' . . . In a 'joint employer' relationship, in contrast, 'there is no single integrated enterprise. A conclusion that employers are 'joint assumes that they are separate legal entities, but that they . . . handle certain aspects of their employer-employee relationship jointly.'" *Id.* at 198 (quoting *Clinton's Ditch Cooperative Co. v. NLRB*, 778 F.2d 132 (2d Cir. 1985)). Relying on *Arculeo*, plaintiff primarily argues that GSA and G4S were her joint employers. (Pl's Mem. at 9–11.)[9]

In *Shifflet*, the Circuit stated that it has "not yet 'fully described a test for what constitutes joint employment in the context of Title VII.'" *Shifflet v. Scores Holding Co., Inc.*, 601 Fed. Appx.

---

[9] Plaintiff argues that G4S and GSA were a single employer only in one footnote. (Pl's Mem. at 11 n.14.) This argument is easily rejected. GSA—an independent federal agency responsible for providing office space to federal employees—is not involved in a single, integrated enterprise with a private security firm. G4S is neither owned by GSA nor are they under common ownership or management. *Arculeo*, 425 F.3d at 198.

8

28, 30 (2d Cir. 2015) (quoting *Arculeo*, 425 F.3d at 199 n.7). The Circuit did, however, note that courts have looked to "commonality of hiring, firing, discipline, pay, insurance, records, and supervision" in determining whether entities constitute joint employers. *Id.*; *Griffin v. Sirva Inc.*, 835 F.3d 283, 292–93 (2d Cir. 2016).[10]

## IV. Analysis

An "essential element under any determination of joint employer status in a subcontracting context is . . . sufficient evidence of immediate control over the employees." *Clinton's Ditch*, 778 F.2d at 138. To determine the degree of immediate control over employees, I look to whether GSA and G4S share "commonality of hiring, firing, discipline, pay, insurance, records, and supervision." *Shifflet*, 601 Fed. Appx. at 30; *Serv. Employees Int'l Union, Local 32BJ v. NLRB*, 647 F.3d 435, 442 (2d Cir. 2011).[11] The analysis "does not turn on the perceptions of the employee

---

[10] Defendant relies heavily on *Gulino*, *supra*, where the Court of Appeals appears to have conflated the factors applicable to the single integrated employer test with the factors applicable to determining who is a joint employer. Later cases in the Court of Appeals confirm that the joint employer test used in *Clinton's Ditch* and *Arculeo* is to be used, and they ignore *Gulino* in that regard. *Shifflet*, 601 Fed. Appx. at 30; *Griffin*, 835 F.3d 292–93. Recent district court cases have also rested on *Arculeo* and *Clinton's Ditch*, and not on *Gulino*. *See, e.g.*, *Lawrence v. Intl. Business Machine Corp.*, 2017 WL 3278917 at *5 (S.D.N.Y. Aug. 1, 2017); *Popat v. Levy*, 2017 WL 2210762 at *6–7 (W.D.N.Y. May 19, 2017); *Scott v. ProClaim America, Inc.*, 2017 WL 1208437 at *8 n.6 (E.D.N.Y. Mar. 31, 2017). I will do the same. *House v. Wackenhut Services, Inc.*, 2012 WL 4017334 at *10 (S.D.N.Y. 2012), also relied upon by defendant, was decided after *Gulino* but before the more recent Court of Appeals cases; its analytical framework will therefore not be followed here.

[11] Plaintiff argues that the "extent of the employer's right to control the means and manner of the worker's performance is the most important factor[,]" and that other factors are "of marginal importance." (Pl's Mem. at 12) (quoting *Haight v. NYU Langone Medical Center Inc.*, 13 Civ. 4993 (LGS), 2014 WL 2933190 at *11 (S.D.N.Y. June 27, 2014)). In support of that proposition, *Haight* relies only on *Amarnare v. Merrill Lynch*, 611 F. Supp. 344, 348 (S.D.N.Y. 1984). *Amarnare* was decided before the Second Circuit had issued a decision on the joint employer standard, and the court cited only to a D.C. Circuit case to support the proposition that control of the manner of the worker's performance is the most important factor. *Id.* at 348 n.14. That language was not adopted by the Second Circuit in *Clinton's Ditch*, *Arculeo*, *Shifflett*, or *Griffin*. I therefore decline to adopt it here.

since employee control is primarily a function of the objective relationship and understandings of the affected employers." *Martin v. Purolater Courier*, 1996 WL 429016 at *4 (E.D.N.Y. July 25, 1996).

Several factors undisputedly weigh in favor of GSA. Plaintiff does not allege any facts that would indicate that GSA has any role in G4S's hiring, maintenance of records of her hours, handling the payroll, or providing insurance. In fact, plaintiff testified that G4S and FPS, and not GSA, would maintain records of her postings. Finally, the collective bargaining factor does not appear relevant here, as no collective bargaining process is alleged to have taken place between G4S and its employees. The only factors that could weigh in plaintiff's favor are commonality of supervision and discipline.

### A. Supervision

Plaintiff testified that GSA property managers did not work at the magnetometers, but they would stand at the magnetometers and give her orders. Plaintiff gives three examples of such orders. One is Sarnecky's order that she give a visitor an anal cavity search, which all parties agree he did not have the authority to issue and which therefore does not bear on the scope of GSA's control over PSOs. Second, as a general matter, GSA personnel had to sign-in contractors who were bringing tools into the building to do work, so they would come to plaintiff's post to do so; GSA, as the manager of the building, could tell PSOs that certain people should or should not be permitted into the building. The third example is that a GSA employee ordered plaintiff to operate an elevator that she was not trained to operate and was not part of her post order.

Where supervision "consists primarily of telling employees what work to perform, or where and when to perform the work, but not how to perform the work," the supervision does not support a joint employer finding. *Serv. Employees Int'l Union, Local 32BJ v. N.L.R.B.*, 647 F.3d

435, 443 (2d Cir. 2011)); *Liotard v. Fedex Corp.*, 14 Civ. 2083 (NSR), 2016 WL 1071034 at *6 (S.D.N.Y. Mar. 17, 2016). Plaintiff admits she was trained on how to do her work at the X-ray machine and the metal detector by FPS officers, who worked for DHS, not GSA. She could sometimes be instructed to do a pat-down search, but that instruction would come from FPS or a G4S supervisor, not GSA. It does not appear that GSA ever instructed plaintiff on **how** to do her work. Rather, in keeping with the subcontractor-contractor relationship, G4S was provided with a general statement of work to be performed, but the manner and details of how to perform the work was left to G4S.[12] I therefore find that this factor weighs against a finding that GSA was a joint employer of PSOs.

### B.    Discipline

Plaintiff does not allege that GSA had any role in administering disciplinary procedures (nor does she allege she went through any disciplinary procedures as it relates to this case). Plaintiff did testify about a time she was disciplined for incorrectly filling out timesheets. The discipline came from plaintiff's direct supervisor at G4S. She also testified that she was aware of other PSO's being disciplined, and they would either be called to G4S project manager James Carbonaro's office or receive it from their G4S supervisor.

Plaintiff argues, however, that her transfer and the reduction in her hours were punitive measures meant to "discipline" her for filing a complaint against Sarnecky, and therefore GSA had some role in initiating discipline. Sarnecky was a property manager. The formal job description of a property manager does not mention supervising, transferring, or disciplining of PSOs. Under the

---

[12] I note, however that the subcontractor-contractor relationship here was between G4S and DHS. GSA was not a party to their contract and has an even more attenuated relationship with G4S than does DHS, which at least trained PSOs.

Statement of Work between FPS and G4S, G4S retained the responsibility for supervision and management of PSOs. Nonetheless, plaintiff testified that she was told it was Sarnecky who had gotten her transferred and "when FPS or GSA gives the contracting company such as G4S the order it supersedes anything that is written on paper." (Pl.'s June 7, 2016 Dep. at 94.) She further testified that GSA has final say over her transfer and hours, using the example of Sarnecky getting her transferred and cutting her hours as her basis for that belief. (Pl.'s Mar. 17, 2016 Dep. at 88–89, 157.) Reviewing all the testimony plaintiff proffers to the effect that GSA had authority to transfer her or change her hours, and even assuming I treat plaintiff's statements as to GSA's authority as if they were made on personal knowledge, rather than as conclusions drawn from what she was told by others, a reasonable jury could conclude at most that Sarnecky requested, or even demanded, that G4S transfer plaintiff and reduce her hours, and that G4S complied. That would still be insufficient to make GSA a joint employer. On this point, *Clinton's Ditch* is instructive.

Clinton's Ditch Cooperative ran a bottling plant, which subcontracted its shipping to a shipping company, which employed drivers. *Clinton's Ditch*, 778 F.2d at 133. The question in the case was whether Clinton's Ditch was a joint employer of the drivers. The ALJ[13] had found that Clinton's Ditch was a joint employer, in part because it "effectively" disciplined drivers. While it had no formal authority to issue discipline, Clinton's Ditch notified its members that they should contact Clinton's Ditch if they had "any problems" with, or encountered "foul or abusive language" from, the drivers. When it received complaints, Clinton's Ditch would complain to the shipping company about certain drivers and expected appropriate action be taken. *Id.* at 138. The ALJ found that the complaint from Clinton's Ditch to the employer, with the expectation that

---

[13] The Circuit was reviewing a decision by the NLRB, which had affirmed the decision of an ALJ in response to a complaint by a union over a refusal to collectively bargain. *Id.* at 136.

discipline would be imposed, was sufficient for this factor to weigh in favor of finding Clinton's Ditch to be a joint employer. The Circuit disagreed and held that "any business has a legitimate interest in determining if its subcontractor's employees have offended its customers or have otherwise provided unsatisfactory service. . . . An employer need not mutely suffer incompetence or misbehavior by its subcontractor's employees in order to avoid status as a joint employer." *Id.*

The same reasoning applies here. Even if GSA, via Sarnecky, requested that plaintiff be transferred, and even if its request was acted upon by G4S, that is not in and of itself sufficient to show a commonality of discipline and/or supervision between G4S and GSA. *See, e.g., Gonzalez v. Allied Barton Sec. Servs.*, 2010 WL 3766964 at *4 (S.D.N.Y. Sept. 7, 2010), *report and recommendation adopted* 2010 WL 3766954 (S.D.N.Y. Sept. 27, 2010) (While DOT was permitted to request that a guard not be assigned to its sites, AlliedBarton made the final decision about all transfers. DOT's ability to request reassignment did not constitute an employer relationship); *McCray v. City University of New York*, 2011 WL 1197467 at *4 ("that a government entity requests that a security guard no longer be assigned to its work sites does not in itself give rise to an employer-employee relationship"); *Cf. Jiggetts v. New York City Dep't of Citywide Admin. Servs.*, 2012 WL 231566, at *7 (S.D.N.Y. Jan. 6, 2012), *report and recommendation adopted*, 2012 WL 614310 (S.D.N.Y. Feb. 27, 2012) (declining to dismiss on joint employment grounds where plaintiff alleged that the defendant agency had the right to interview security guards, reject proposed guards, request retraining or replacement of guards, and demand removal of guards). The contract and Statement of Work make it clear that GSA has no direct role in supervising, hiring, disciplining, or firing PSOs, and while Sarnecky made a request to G4S, and G4S complied, plaintiff puts forth no evidence to dispute defendant's assertions that G4S had final

say over plaintiff's employment. No matter how forceful Sarnecky's request was, G4S retained final authority over whether plaintiff would be transferred and what hours she would work.

After applying the joint employer test to the evidence, I find that no reasonable jury could find that GSA was the joint employer of G4S Protective Security Officers who worked in buildings managed by GSA. Plaintiff therefore cannot bring claims against GSA under Title VII. It is not necessary to reach defendant's argument that plaintiff failed to timely exhaust her administrative remedies prior to filing suit.

## CONCLUSION

For the reasons discussed above, defendant GSA's motion for summary judgment on plaintiff's hostile work environment and retaliation claims is GRANTED. The Clerk of Court is directed to enter judgment in favor of defendant GSA on all claims. As the claims against the other defendants have already been resolved, the Clerk of Court is further directed to close the case.

SO ORDERED.

/s/ *Nina Gershon*
NINA GERSHON
United States District Judge

Dated: November 8, 2017
Brooklyn, New York